UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DESMOND MAURICE KINDLE,

                Petitioner,

v.                                     Case No. 12-15269

SHERRY BURT,                   HON. AVERN COHN

                Respondent.

_____/


**<u>MEMORANDUM AND ORDER</u>**
**<u>DENYING THE PETITION FOR WRIT OF HABEAS CORPUS</u>**
**<u>AND</u>**
**<u>DENYING A CERTIFICATE OF APPEALABILITY</u>**

**TABLE OF CONTENTS**

| | | | |
|---|---|---|---|
| I. | Introduction | | 1 |
| II. | Background | | 1 |
| | A. | The Trial | 2 |
| | B. | Direct Review | 8 |
| | C. | Collateral Review | 9 |
| | D. | Habeas Review | 10 |
| III. | Standard of Review | | 10 |
| IV. | Petitioner's Claims | | 12 |
| | A. | The Lack of a Transcript | 12 |
| | | 1.  Procedural Default | 13 |
| | |     a.  The First Factor | 13 |
| | |     b.  The Second Factor | 14 |
| | |     c.  The Third Factor | 14 |
| | |     d.  The Fourth Factor | 14 |
| | | 2.  Miscarriage of Justice | 17 |
| | B. | Failure to Adjourn the Trial | 18 |
| | | 1.  Clearly Established Federal Law | 18 |
| | | 2.  Analysis | 18 |
| | C. | Double Jeopardy | 19 |
| | | 1.  Clearly Established Federal Law | 19 |
| | | 2.  The Misconduct | 20 |
| | | 3.  The State Court Decisions | 20 |
| | | 4.  Analysis | 21 |
| | D. | False Testimony | 21 |
| | | 1.  The Claim | 21 |
| | | 2.  The State Court Decisions | 21 |
| | | 3.  Clearly Established Federal Law | 23 |
| | | 4.  Analysis | 23 |
| | E. | Ineffective Assistance of Trial Counsel | 25 |
| | | 1.  The State Court Decisions | 25 |
| | | 2.  Clearly Established Federal Law | 26 |
| | | 3.  Analysis | 26 |
| | |     a.  Failure to Object to Testimony | 26 |
| | |     b.  Failure to Object to Untimely Transcripts | 28 |
| | |     c.  Failure to Obtain a Request for Services | 28 |
| | | 4.  Conclusion on Trial Counsel | 29 |
| | F. | Ineffective Assistance of Appellate Counsel | 29 |
| | | 1.  The Claim and State Court Decisions | 29 |
| | | 2.  Analysis | 29 |
| V. | Certificate of Appealability | | 30 |
| VI. | Conclusion | | 31 |

i

## I.  Introduction

This is a habeas case under 28 U.S.C. § 2254.  Petitioner Desmond Maurice Kindle is a state prisoner at Handlon Correctional Facility in Ionia, Michigan.  He was convicted in 2007 of four counts of assault with intent to commit murder, M.C.L. § 750.83, one count of being a felon in possession of a firearm, M.C.L.§ 750.224f, one count of discharging a weapon in an occupied building, M.C.L. § 750.234b, and one count of possessing a firearm during the commission of a felony (felony firearm), second offense, M.C.L. § 750.227b(1).  Petitioner, through counsel, raises six claims. Respondent, through the Michigan Attorney General, contends that the claims are either procedurally defaulted or lack merit.  The Court agrees that Petitioner's claims do not warrant habeas relief.  For the reasons that follow, the petition will be denied.

## II.  Background

The charges against Petitioner described above arose from a shooting at a nightclub on Brush Street in Detroit, Michigan.

Petitioner initially was tried before a jury in Wayne County Circuit Court.  On the fifth day of the trial, the trial court declared a mistrial because a police officer testified that a .40 caliber Taurus gun which Petitioner allegedly used in the shooting had been stolen.  Petitioner subsequently moved to dismiss the case on the grounds that the prosecutor's misconduct was the cause of the mistrial.  The trial court denied the motion and found that Petitioner could be retried.  The trial court also denied Petitioner's pro se motion for reconsideration of the decision to retry him.  The second trial was a bench trial.

1

### A.  The Trial

A review of the record show that the following evidence was presented at trial:

Christopher Henderson testified that he was a reserve officer for the Detroit Police Department and on November 3, 2006, he was working as a security guard at the Steel Bar on Brush Street in Detroit.  Three other reserve officers (Thomas Kemp, Robert Donaldson, and Felando Merriweather) were working with him that night.  At some point, he and Kemp went to the second floor of the bar where he noticed a group of men arguing and pushing each other.  Then he heard gunshots.  As he crouched down, he saw Petitioner approach the stairs while firing a gun.  He (Henderson) fired back in Petitioner's direction.  At the time, he did not know where Kemp was, and even though he remembered shooting only three times, he admitted that a firearms report indicated he fired his gun five times.

Henderson further testified that Petitioner dropped the gun he was carrying and that it fell on the landing.  Petitioner then went down the stairs.  Henderson pursued Petitioner out the front door of the club while yelling, "He is the shooter."  Donaldson and Merriweather were outside at the time.  Merriweather gave chase, caught Petitioner, and handcuffed him.  Petitioner was wearing a black jacket that night; he took the jacket off outside and threw it on the ground.

Continuing, Henderson testified that he went back inside the club after Petitioner was detained and noticed that Kemp was lying at the bottom of the stairs.  He took a gun from Kemp's hand; he was unable to locate the gun that Petitioner had dropped.  He handed Kemp's gun and his own gun to police officers who arrived on the scene.

Kemp testified that he possessed two guns while working as a private security

2

guard at the Steel Bar.  One gun was a .357 Sig Glock 33, and the other gun was a .40 caliber Springfield XD 40.  Kemp explained that he usually worked on the lower level of the bar; he went upstairs on the night in question to relieve someone.  About ten or fifteen minutes later, he heard Henderson say, "Gun."  He looked up and saw a person shooting.  He drew his own weapon.   While shoving two young ladies out of the way, he turned his body, was shot three times, and tumbled down the stairs.  Someone later took the weapon that he fired, and the EMS crew took his other gun from him

On February 17, 2007, a police officer showed Kemp a photo array with Petitioner's picture in it.  Although Kemp pointed to someone other than Petitioner in the array, he identified Petitioner at trial as the shooter.

Merriweather was the third Detroit police reserve officer working as a private security officer at the Steel Bar on November 3, 2006.  He testified that he patted Petitioner for weapons when Petitioner entered the club and that he did not find any weapons on him.  He did not check Petitioner's female companion because she stated that she worked there as a waitress.  Later that evening, he heard gunshots and observed Petitioner run out the door followed by Henderson who was saying that Petitioner was the shooter.  Merriweather joined the chase.  He caught Petitioner and handcuffed him; he did not find a weapon on him.

Donaldson was the fourth Detroit police reserve officer working as a security officer at the Steel Bar.  He testified that he first noticed Petitioner upstairs at the club.  Later that evening, he heard gunshots and saw Henderson chase Petitioner out the exit.  Petitioner was wearing a jacket, which he shed as he broke into a run.  Donaldson chased Petitioner along with Henderson and Merriweather, who handcuffed Petitioner

3

after they caught him.  Back at the club, a man handed Donaldson a gun wrapped in a black tablecloth.  He (Donaldson) gave the gun to the uniformed officer who took Petitioner into custody.

Germaine Clinkscales testified that she was shot in the thigh during the shooting at the club.  She did not see anybody fire a gun; she did see one or two people wearing Rock Bottom jackets in the club.

Lacelia Jones also was shot in the leg during the incident.  Before the shooting, she noticed two men who appeared to be having a misunderstanding.  One of the two men was wearing a black and green Rock Bottom Entertainment coat.  She did not see Petitioner at the club and she did not see who shot her.

Krishawn McKissack saw someone strike Petitioner in the face prior to the shooting.  Anthony Yanish testified that he was seated at a table in front of two men who stood up and started arguing.  Yanish subsequently heard gunshots and saw a person with a gun in his hand run toward the stairs.  He did not see the person's face.

Mario Jones was at the club with Carla Lancaster and Eric Draw on the night of the shooting.  He and Ms. Lancaster were upstairs when he heard two men arguing.  He could not see the men's faces at the time, but he heard one man say to another man, "You owe me, you owe me."  Then he heard shooting.  He saw only one shooter that night.  Although he did not see the shooter's face, he saw the shooter run toward the stairs, wearing a black jacket with the words "Rock Bottom" on the back.

Jones said he saw a man with a Rock Bottom jacket in the men's room when he first entered the Steel Bar.  He identified Petitioner at trial as that man.  When asked on cross-examination whether he was identifying a jacket, as opposed to a face, Jones

4

also said that because he did not see the shooter's face, he could not say for sure whether Petitioner was the shooter.

Carla Lancaster testified that she heard the argument in the bar and that one of the men said in an angry voice, "I just did ten years in jail and y'all MFs on me." Subsequently, she heard and saw someone shooting. Although she did not see the shooter's face and could not identify the person with the gun, she noticed that he was wearing a Rock Bottom jacket. She saw someone wearing the same jacket earlier that evening when she entered the men's restroom by mistake. She identified Petitioner at trial as the man who was wearing the Rock Bottom jacket.

Eric Draw was a friend of Mario Jones and Carla Lancaster and an employee of the Steel Bar. He testified that as he was showing Jones and Lancaster around the club on the night of the shooting, he saw Petitioner and a woman in the men's restroom. Petitioner was wearing a Black Bottom jacket. Draw later went upstairs and heard gunshots; he did not see the shooter. Nor did he see Petitioner with a gun.

Caron Felder also an employee of the Steel Bar. He testified that as he approached the establishment from outside he saw security officer Henderson chasing Petitioner. He did not see a gun in Petitioner's hand and he did not see Petitioner throw away a jacket.

Detroit Police Officers John Rose and Darryl Johnson were the first uniformed officers to arrive at the scene. Rose testified that Petitioner was in custody when he arrived at the scene and that Donaldson handed him a gun wrapped in a cloth. He (Officer Rose) placed the gun in an envelope and wrote, "Hold for prints," on the envelope. Someone also gave him Kemp's two guns, which he placed in evidence.

5

Detroit police officer Lisa Bryson responded to the scene.  She attempted to help one of the shooting victims.  Officers Nathan Johnson and Thomas Smith collected casings, bullets, and magazines from the scene following the shooting.  Johnson also performed a gunshot residue test on Petitioner at approximately 4:30 a.m. on November 3, 2006.

Police Officer Kevin Reed testified about the guns and fired evidence submitted to him for identification and comparison.  He testified that some of the cartridges and bullets collected at the scene were fired from the .40 caliber Taurus semiautomatic handgun which the shooter allegedly fired.  Some of the other fired evidence came from the gun used by Henderson, but none of the fired evidence matched the guns possessed by Thomas Kemp on the night of the shooting.  The parties stipulated that, if police officer Lori Briggs were to testify, she would say that the .40 caliber Taurus automatic handgun in evidence was examined for fingerprints and that the results were negative.

William Steiner analyzed the gunshot residue kit that was submitted to him.  He found evidence of gunshot residue on Petitioner's right and left hands, forehead and face, and shirt.  He acknowledged, however, that someone could test positive for gunshot residue if the person were merely in the vicinity of a vapor cloud or if the person touched something that had gunshot residue on it.

Ronald Estill's testimony from the first trial was read into the record.  Estill testified that he was the manager of the Steel Bar and that employees of the bar typically were not searched when entering the bar unless there was something sticking out of their body.  He was working in his basement office on the night of the shooting

6

when one of his waitresses told him of the shooting. He went upstairs where he saw Kemp on the floor. Kemp had a gun in his hand, and Estill's "point man" for security had his gun pointed at the suspect.

The officer in charge of the case, Charles Zwicker, testified that he arranged to have the guns collected at the scene sent to the lab for identification, function, and comparison. He did not ask to have the suspect's weapon (the Taurus handgun) checked for fingerprints because it had been wrapped in a cloth and unwrapped three to four different times and he did not think there would be any readable prints on it. He first learned that the gun was tested for fingerprints after Petitioner's first trial.

Zwicker further testified that no jacket was recovered outside the Steel Lounge and that Kemp selected someone other than Petitioner out of a photo display.

The parties stipulated that Petitioner was convicted of a prior felony and was not eligible to possess or carry a weapon on November 3, 2006. Following the prosecutions case, trial counsel moved for a directed verdict of acquittal on the four counts of assault with intent to commit murder. The trial court denied the motion.

Petitioner was the only defense witness. He testified that he went to the Steel Lounge on November 3, 2006, to shop for an artist because he was trying to get into the music industry and he knew that the Rock Bottom entertainment group would be there. He said that he arrived at the Steel Lounge about 11:30 p.m. and that he was not armed with a gun. He was wearing a gray, long sleeved shirt, black pants, and black Timberland boots, but no coat. He ordered drinks and mingled with people. He then got into an argument with someone named "S Money," who was wearing a Rock Bottom jacket. When "S Money" swung at him, he returned an overhand swing and grabbed "S

7

Money." Then he noticed that "S Money" had a gun in his hand. The gun went off as they tussled. After hearing multiple gunshots, he ran downstairs to Donaldson and hollered for help because he thought that someone was trying to kill him. Henderson then rushed him, and he was tackled to the floor inside the club near the exit. Petitioner denied being inside the men's bathroom that night and also he denied possessing or firing a gun at anyone. He maintained that "S Money" fired the gun.

Trial counsel argued that someone other than Petitioner did the actual shooting, that the shooting was done to facilitate an escape, not with the intent to kill or harm anyone, and that there was reasonable doubt as to the identification of Petitioner as the shooter.

### B. Direct Review

The trial court found Petitioner guilty of the charges noted above. The trial court later sentenced Petitioner to concurrent terms of thirty to fifty years in prison for the assault convictions, two to five years in prison for the felon-in-possession conviction, and two to four years for the discharge-of-a-weapon conviction. The trial court also sentenced Petitioner to a consecutive sentence of five years in prison for the felony firearm conviction.

On direct appeal, Petitioner argued that his second trial violated the Double Jeopardy Clause of the Fifth Amendment because the prosecutor's misconduct caused the mistrial in his first trial. In a pro se supplemental brief, Petitioner argued that prosecution witnesses gave false and perjured testimony, which the prosecutor failed to correct. The Michigan Court of Appeals affirmed his convictions in an unpublished, per curiam opinion. See People v. Kindle, No. 278583, 2009 WL 2343159 (Mich. Ct. App.

8

July 30, 2009).  Petitioner raised the same claims in the Michigan Supreme Court,

which denied leave to appeal on December 21, 2009, because it was not persuaded to

review the issues.  See People v. Kindle, 485 Mich. 1011 (2009) (table).

### C.  Collateral Review

Petitioner filed a motion for relief from judgment in the trial court, raising the

following claims:  (1) his right to cross-examine witnesses was violated by the trial

court's failure to order the complete transcript of the first trial; (2) the trial court abused

its discretion and deprived him of a fair trial by refusing to adjourn the retrial to allow for

the transcription of the first trial; (3) trial counsel was ineffective for (a) failing to object to

the prosecutor's presentation of testimony from Mario Jones, Eric Draw, and Carla

Lancaster and (b) failing to object on constitutional grounds to the untimely production

of transcripts; and (4) appellate counsel was ineffective for failing to raise these issues

on appeal.  In a supplemental motion, Petitioner argued that the trial court abused its

discretion by denying his motion to reconsider the decision to retry him.

The trial court denied Petitioner's motion for relief from judgment.  However it

ordered an evidentiary hearing on the issue of whether the court was misled by material

facts when it denied Petitioner's motion for reconsideration of the court's ruling

regarding a second trial.  See People v. Kindle, No. 2006-013250-01 (Wayne County

Cir. Ct. June 2, 2011).  The prosecutor opposed an evidentiary hearing.  The trial court

then rescinded its order to hold an evidentiary hearing.  See Opinion & Order

Reconsidering the Court's Previous Ruling for the Allowance of an Evidentiary Hearing,

No. 06-013250-01-FC (Wayne County Cir. Ct. Sept. 9, 2011).

Petitioner appealed the denial of his motion for relief from judgment to the

9

Michigan Court of Appeals.  The Court of Appeals denied leave to appeal because

Petitioner failed to establish entitlement to relief under Michigan Court Rule 6.508(D).

See People v. Kindle, No. 307486 (Mich. Ct. App. June 8, 2012).  The Michigan

Supreme Court denied leave to appeal for the same reason.  See People v. Kindle, 493

Mich. 894 (2012) (table).

### D.  Habeas Review

Petitioner then filed the instant petition through counsel.  He raises the following

claims:  (1) the trial court violated his right to cross examine the witnesses against him

by failing to order the full transcription of the prior trial; (2) the trial court's refusal to

adjourn the retrial to allow for the transcription of the previous trial deprived him of a fair

trial; (3) his second trial violated his rights under the Double Jeopardy Clause of the

Fifth Amendment; (4) the prosecution deprived him of a fair trial by presenting testimony

that it knew or should have known was false; (5) trial counsel deprived him of effective

assistance; and (6) appellate counsel deprived him of effective assistance on direct

appeal.

### III.  Standard of Review

28 U.S.C. § 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody
pursuant to the judgment of a State court shall not be granted with respect
to any claim that was adjudicated on the merits in State court proceedings
unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the State

10

court proceedings.

28 U.S.C. § 2254(d).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.' " Mitchell v. Esparza, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." Wiggins v. Smith, 539 U.S. 510, 520 (2003) (quoting Williams, 529 U.S. at 413).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly,

> [w]hen reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong. Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Harrington, supra, at 102–103, 131 S.Ct. 770 (internal quotation marks omitted). This is especially true for claims of ineffective assistance of counsel, where AEDPA review must be " ' "doubly deferential" ' " in order to afford "both the state court and the defense attorney the benefit of the doubt." Burt v. Titlow, 571 U.S. ——, ——, 134 S.Ct. 10, 13, 187 L.Ed.2d 348 (2013) (quoting Cullen v. Pinholster, 563 U.S. 170, ——, 131 S.Ct. 1388, 1403, 179 L.Ed.2d 557 (2011)).

11

Woods v. Donald, 135 S. Ct. 1372, 1376 (2015) (per curiam).  "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Harrington, 562 U.S. at 103.

In simple terms, the Supreme Court has said that the standard of review is "difficult to meet" and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt."  Pinholster, 131 S. Ct. at 1398 (quoting Harrington, 562 U.S. at 102, and Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam)).  The Supreme Court has further said that a federal court must guard against "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts."  Renico v. Lett, 559 U.S. 766, 779 (2010).

Finally, a federal habeas court must presume the correctness of state court factual determinations.  See 28 U.S.C. § 2254(e)(1).  A petitioner may rebut this presumption only with clear and convincing evidence.  Warren v. Smith, 161 F.3d 358, 360-61 (6th Cir. 1998).

## IV.  Petitioner's Claims

## A.  The Lack of a Transcript

Petitioner says that the trial court violated his constitutional rights by failing to order the complete transcript of his first trial.  Specifically, Petitioner contends that the lack of a complete transcript violated his right to a fair trial, his right to cross examine

12

the witnesses against him, and his right to equal protection and due process of law.

Respondent says that this claim is procedurally defaulted because Petitioner did not raise the claim on direct appeal and because the trial court rejected his claim on that basis during state collateral proceedings. Respondent argues in the alternative that any error was harmless

## 1. Procedural Default

The doctrine of procedural default prohibits a federal court from reviewing the merits of a habeas petitioner's claims, including constitutional claims, if a state court declined to hear the claims because the prisoner failed to abide by a state procedural rule. Martinez v. Ryan, 132 S. Ct. 1309, 1316 (2012). In this Circuit,

> "[a] habeas petitioner's claim will be deemed procedurally defaulted if each of the following four factors is met: (1) the petitioner failed to comply with a state procedural rule; (2) the state courts enforced the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner has not shown cause and prejudice excusing the default." [Jalowiec v. Bradshaw, 657 F.3d 293, 302 (6th Cir. 2011)]. To determine whether a state procedural rule was applied to bar a habeas claim, [courts] look "to the last reasoned state court decision disposing of the claim." Guilmette v. Howes, 624 F.3d 286, 291 (6th Cir. 2010) (en banc).

Henderson v. Palmer, 730 F.3d 554, 560 (6th Cir. 2013).

## a. The First Factor

The state procedural rule in question here is Michigan Court Rule 6.508(D)(3), which prohibits state courts from granting relief from judgment if a defendant could have raised his claims on appeal from his judgment or sentence. An exception to this rule exists where the defendant shows "good cause" for his or her failure to raise the claims on appeal and "actual prejudice from the alleged irregularities that support the claim for

13

relief." Mich. Ct. R. 6.508(D)(3)(a) and (b). Petitioner violated Rule 6.508(D)(3) by first raising his claim about the lack of a complete transcript in his motion for relief from judgment rather than on direct appeal from his convictions. Thus, the first factor is satisfied.

### b. The Second Factor

The last state court to review Petitioner's claim in a reasoned opinion was the trial court, which enforced Rule 6.508(D)(3) in its order denying Petitioner's motion for relief from judgment. The trial court cited the rule and then stated that Petitioner had not shown "good cause" for failing to address his claim in his appeal of right. The second factor is satisfied.

### c. The Third Factor

The third factor is satisfied if the state procedural rule in question was an adequate and independent state ground for denying review of a federal constitutional claim. The Sixth Circuit has determined that the procedural bar found in Rule 6.508(D) is an adequate and independent state ground on which Michigan courts may rely in foreclosing review of federal claims. Howard v. Bouchard, 405 F.3d 459, 477 (6th Cir. 2005) (citing Simpson v. Jones, 238 F.3d 399, 407-08 (6th Cir. 2000), and Munson v. Kapture, 384 F.3d 310, 315 (6th Cir. 2004)). Thus, the third factor is satisfied.

### d. The Fourth Factor

The fourth and final factor is whether Petitioner has shown "cause" for his failure to raise his claim on direct appeal and prejudice from the alleged irregularity that supports his claim. Petitioner alleges that his appellate attorney was ineffective for not

14

raising all his claims in the appeal of right.

**1)**

Ineffective assistance of counsel that rises to the level of a Sixth Amendment violation is cause for a procedural default.  Murray v. Carrier, 477 U.S. 478, 488 (1986).  But an appellate attorney is not required to raise every non-frivolous claim requested by his or her client if counsel decides, as a matter of professional judgment, not to raise the claim.  Jones v. Barnes, 463 U.S. 745, 751 (1983).  To demonstrate that appellate counsel was ineffective, a habeas petitioner must show (1) that his attorney acted unreasonably in failing to discover and raise nonfrivolous issues on appeal and (2) there is a reasonable probability that he would have prevailed on appeal were it not for his appellate attorney's failure to raise the issue.  Smith v. Robbins, 528 U.S. 259, 285 (2000) (citing Strickland, 466 U.S. at 687-91, 694).

Petitioner's underlying claim is that he was indigent at trial and deprived of a complete transcript of his first trial before he was tried a second time.  The Supreme Court has said that

> the State must, as a matter of equal protection, provide indigent prisoners with the basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners.  While the outer limits of that principle are not clear, there can be no doubt that the State must provide an indigent defendant with a transcript of prior proceedings when that transcript is needed for an effective defense or appeal.

Britt v. North Carolina, 404 U.S. 226, 227 (1971).

**2)**

Petitioner's first trial ended with a mistrial on March 2, 2007, after five days of testimony.  At a subsequent motion hearing on March 5, 2007, Petitioner's appointed

attorney requested the transcript of Petitioner's first trial, and the trial court granted the request.  (Mot. Hr'g, 5, 11, Mar. 5, 2007.)  As of April 19, 2007, defense counsel had only one transcript, and he stated at a motion hearing on that date that he needed the transcripts in order to prepare for the second trial.  (Mot. Hr'g, 33-37, Apr. 19, 2007.)

On the first day of the second trial, however, defense counsel stated that he had received "a huge transcript with a lot of the witnesses' testimony," and that it was his understanding, after talking with the court reporter, that another volume of transcript would be forthcoming for his and Petitioner's use at trial.  Defense counsel concluded his comments about the transcripts by stating that the parties had control over the issue. (Trial Tr. Vol. I, 8-9, Apr. 25, 2007.)

The record demonstrates that defense counsel used portions of the transcript of the first trial when cross-examining witnesses.  (Trial Tr. Vol. II, 43, 67, 136, Apr. 26, 2007; Trial Tr. Vol. III, 27-29, Apr. 27, 2007.)[1]

Appellate counsel could have reasonably concluded from the record that Petitioner received the transcripts that were needed for an effective defense.  Appellate counsel also could have concluded that, to the extent a portion of the transcript of the first trial was missing, Petitioner waived the issue when defense counsel stated that the issue was under control.

The Court concludes that appellate counsel was not ineffective for failing to raise a claim about the transcript of the first trial.  Because appellate counsel was not

---

[1] Although defense counsel said at one point during the second trial that the parties did not have the transcript of a particular witness (Trial Tr. Vol. II, 159, Apr. 26, 2007), counsel appears to have been referring to the woman who was with Petitioner on the night of the shooting.  That person did not testify at the first trial.

16

constitutionally ineffective, he cannot be considered "cause" for Petitioner's procedural default.

## 2. Miscarriage of Justice

Having determined that "cause" does not exist to excuse Petitioner's procedural default, the Court need not decide whether Petitioner suffered any prejudice from the claimed error. Carter v. Mitchell, 443 F.3d 517, 538 (6th Cir. 2006) (citing Lott v. Coyle, 261 F.3d 594, 609 (6th Cir. 2001)). In the absence of "cause and prejudice," Petitioner can prevail on his procedurally defaulted claims only if he "demonstrate[s] that the failure to consider [his claim] will result in a fundamental miscarriage of justice. A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" Lundgren v. Mitchell, 440 F.3d 754, 764 (6th Cir. 2006) (citing Murray v. Carrier, 477 U.S. 478, 496 (1986)). To be credible, however, "such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." Schlup v. Delo, 513 U.S. 298, 324 (1995). "A petitioner's burden at th[is] gateway stage is to demonstrate that more likely than not, in light of the new evidence . . . any reasonable juror would have reasonable doubt." House v. Bell, 547 U.S. 518, 538 (2006).

Petitioner has not offered any new evidence of actual innocence, and the evidence against him at trial was substantial. The claim is procedurally defaulted and Petitioner has not overcome his procedural default of his claim regarding the lack of a transcript.

## B. Failure to Adjourn the Trial

17

In this second claim, Petitioner argues that the trial court violated his right to a

fair trial and due process of law by refusing to adjourn the second trial to allow for all of

the transcripts from the first trial.  Petitioner raised this issue in his motion for relief from

judgment.  The trial court found no merit in Petitioner's position

### 1.  Clearly Established Federal Law

The Court of Appeals for the Sixth Circuit explained in Franklin v. Bradshaw, 695

F.3d 439 (6th Cir. 2012), cert. denied, 133 S. Ct. 1724 (2013), that

> [t]rial courts are granted broad discretion on matters of
> continuances.  Morris v. Slappy, 461 U.S. 1, 11, 103 S.Ct. 1610, 75
> L.Ed.2d 610 (1983).  "The denial of a defendant's motion for a
> continuance amounts to a constitutional violation only if there is an
> unreasoning and arbitrary insistence upon expeditiousness in the face of a
> justifiable request for delay."  United States v. King, 127 F.3d 483, 486–87
> (6th Cir. 1997) (internal quotation marks omitted); see also Morris, 461
> U.S. at 11–12, 103 S.Ct. 1610. . . .
>
> . . . .
>
> It is not enough for the defendant to demonstrate error, however.  He must
> demonstrate reversible error: that the continuance's denial "resulted in
> actual prejudice to his defense."  King, 127 F.3d at 487 (internal quotation
> marks omitted).  "The defendant demonstrates 'actual prejudice' by
> showing that a continuance would have made relevant witnesses available
> or added something to the defense."  Ibid.

Id. at 452-53.

### 2.  Analysis

The trial court's denial of trial counsel's motion for a continuance was not

arbitrary or unreasonable, considering that the parties had tried most of the case during

Petitioner's first trial.  Petitioner also has not shown that he was actually prejudiced by

the denial of trial counsel's motion for a continuance, given trial counsel's comments

that he had a lot of the witnesses' prior testimony, that he was expecting an additional

18

volume of transcript, and that the issue was under control.  Petitioner is therefore not entitled to relief on this claim.

## C.  Double Jeopardy

In this third claim, Petitioner contends that the second trial was barred by the Double Jeopardy Clause of the Fifth Amendment.  Although Petitioner requested, and was granted, a mistrial during his first trial, he contends that the mistrial was due to prosecutorial misconduct and, therefore, he should not have been tried a second time.

### 1.  Clearly Established Federal Law

The Double Jeopardy Clause, which is "applicable to the States through the Fourteenth Amendment," Lockhart v. Nelson, 488 U.S. 33, 38 (1988), states that "[n]o person shall be . . . subject for the same offence to be twice put in jeopardy of life or limb."  U.S. Const. AMEND. V.  The Amendment, however, does not preclude a prosecutor from "retrying a defendant whose conviction is set aside because of an error in the proceedings leading to conviction."  United States v. Tateo, 377 U.S. 463, 465 (1964).  An exception to the rule permitting a retrial applies where governmental action is intended to provoke a mistrial request and thereby subject the defendant to the burden imposed by multiple prosecutions.  United States v. Dinitz, 424 U.S. 600, 611 (1976).  In other words, "the circumstances under which . . . a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial."  Oregon v. Kennedy, 456 U.S. 667, 679 (1982).

19

## 2.  The Misconduct

During Petitioner' first trial, police officer Charles Zwicker testified in response to

the prosecutor's questions that his investigation of the gun linked to Petitioner revealed

that the gun "was listed as stolen out of the city of Southfield on . . . August 18, 2006."

(Trial Tr. Vol. V, 15, Mar. 2, 2007.)  In the jury's absence, trial counsel moved for a

mistrial on grounds that the prosecutor never informed him that the gun was stolen and

that the testimony was inadmissible, highly prejudicial, and probative of nothing.  After a

discussion on the issue, the trial court advised Petitioner that he would be retried if the

motion were granted.  Petitioner then consented to a mistrial.  The trial court granted the

motion for a mistrial.  (Id. at 15-47.)

## 3.  The State Court Decisions

Petitioner moved to dismiss the charges against him on the basis that the

prosecutor withheld information about the stolen gun and goaded him into moving for a

mistrial.  (Mot. Hr'g. 3-8, Apr. 19, 2007.)  The trial court denied the motion after stating

that, although it used the phrase "prosecutorial misconduct" when granting the motion

for mistrial, the prosecutor's conduct was "in actuality . . . an act of negligence as

opposed to intentional wrongdoing . . . ."  (Id. at 5.)  Accordingly, the trial court denied

Petitioner's motion to dismiss.  (Id. at 6.)

Petitioner moved for reconsideration on the first day of his second trial.  The trial

court denied the motion after stating that there was no evidence that would warrant

reversal of the its prior order.  (Trial Tr. Vol. I, 17-20, Apr. 25, 2007.)  The Michigan

Court of Appeals affirmed the trial court's, stating that "[o]n the basis of the objective

evidence in the record, the trial court's determination that the prosecutor did not intend

20

to provoke defendant into moving for a mistrial was not clearly erroneous." Kindle, 2009 WL 2343159, at *4.

Petitioner raised the issue again in his motion for relief from judgment. The trial court initially granted an evidentiary hearing on the basis that it might have been misled on material facts. On reconsideration, the trial court declined to grant a hearing because it was not persuaded that additional testimony was necessary.

### 4. Analysis

The state courts' decisions on Petitioner's double jeopardy claim were objectively reasonable. First, the prosecutor asserted a proper motive for eliciting testimony that the weapon in question was stolen. She stated that she elicited testimony about the stolen nature of the weapon to show that the officer in charge of the case thoroughly investigated the case. She was trying to refute an anticipated defense argument that the investigation was slipshod. (Trial Tr. Vol. V, 28-29, Mar. 2, 2007.) At a subsequent hearing, the prosecutor maintained that evidence about the stolen gun was admissible for a proper purpose. (Mot. Hr'g, 20, Apr. 19, 2007.)

An additional reason for concluding that the prosecutor did not intend to goad Petitioner into moving for a mistrial is the fact that the prosecutor encouraged the trial court to read a curative jury instruction to the jury rather than grant a mistrial. The prosecutor drafted a curative jury instruction, which stated that she was not claiming Petitioner stole the gun and that the jury should use testimony about the stolen weapon for the limited purpose of determining the nature and extent of the police investigation. (Trial Tr. Vol. V, 31-32, 34-35, Mar. 2, 2007.) The prosecutor also agreed not to mention in her closing argument that the weapon was stolen. (Id. at 37.)

21

Given the prosecutor's position that the disputed testimony was admissible, and given the request for a curative jury instruction, as opposed to a mistrial, it appears that the prosecutor did not intend to provoke Petitioner into moving for a mistrial.

Overall, the state courts' conclusions that the prosecutor did not engage in intentional wrongdoing was objectively reasonable.  Petitioner is not entitled to relief on his double jeopardy claim.

### D.  False Testimony

#### 1.  The Claim

Petitioner next says that the prosecutor committed misconduct by presenting testimony that it knew or should have known was false.  Specifically, Petitioner contends that Zwicker testified falsely when he stated that he did not ask to have the gun attributed to Petitioner tested for fingerprints.  Petitioner says he has new evidence proving that Zwicker did ask to have the gun tested for fingerprints.  Petitioner concludes from this new evidence that Zwicker committed perjury when he testified that he did not ask to have the gun tested for fingerprints.  Petitioner further says that the prosecutor knew Zwicker was testifying falsely and failed to correct the false testimony.

#### 2.  The State Court Decisions

Petitioner first raised this claim in his pro se brief on direct appeal.  The Michigan Court of Appeals rejected the claim because Petitioner failed to demonstrate that Zwicker's testimony was false or that Petitioner was denied a fair trial as a result of his testimony.

Petitioner raised the issue again in a supplemental brief in support of his motion

for relief from judgment.  The trial court concluded that an evidentiary hearing was unnecessary and denied relief.

### 3.  Clearly Established Federal Law

Prosecutors may not deliberately deceive a court or jurors by presenting evidence that they know is false.  <u>Giglio v. United States</u>, 405 U.S. 150, 153 (1972). Nor may they allow false testimony to go uncorrected when it appears.  <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959).  But to prevail on a claim that the prosecutor relied on false testimony, a habeas petitioner must show that (1) the testimony was actually false, (2) the testimony was material, and (3) the prosecutor knew the testimony was false. <u>Amos v. Renico</u>, 683 F.3d 720, 728 (6th Cir. 2012); <u>Coe v. Bell</u>, 161 F.3d 320, 343 (6th Cir. 1998) (quoting <u>United States v. Lochmondy</u>, 890 F.2d 817, 822 (6th Cir. 1989)).

### 4.  Analysis

The officer in charge of Petitioner's case, Zwicker, testified at the first trial that he did not ask to have the gun attributed to Petitioner tested for fingerprints.  His reasons for not requesting a fingerprint test were (1) the prosecution had a good witness who saw Petitioner fire the gun and (2) the gun had been wrapped in a table cloth by an unknown person and subsequently unwrapped and re-wrapped by both a security officer and a police officer.  In Zwicker's opinion, any fingerprints on the gun would have been wiped off by those events and it would have been a waste of time to check for fingerprints.  (Trial Tr. Vol. V, 11-12, Mar. 2, 2007.)

After the first trial, the prosecutor learned that the gun had been tested for fingerprints and that the results were negative.  (Mot. Hr'g, 12, Mar. 5, 2007.)  She subsequently offered two explanations for how the gun got tested despite Zwicker's

23

failure to request fingerprinting of the gun.  One explanation was that the gun was automatically tested because it was reported as stolen.  (Id. at 12.)  A second explanation was that the gun was placed in a bag and labeled, "Hold for prints" by a uniformed officer other than Zwicker and then tested in anticipation of a formal request by Zwicker.[2]  And because Zwicker never made a formal request for fingerprinting of the gun, the test results were not sent to him before the first trial.  (Mot. Hr'g., 10-11, Apr. 19, 2007; Trial Tr. Vol. I, 12-17, Apr. 25, 2007.)

One of Petitioner's exhibits on habeas review is the "Request for Laboratory Service," which lists  "P.O.  Zwicker" as the person requesting tests on the gun in question.  See ECF No. 3-1.  According to Petitioner, this is proof that Zwicker asked to have the gun fingerprinted.  Zwicker did not sign the form.  He continued to maintain at Petitioner's second trial that he did not request fingerprint tests on the gun.  (Trial Tr. Vol. IV, 37-39, Apr. 30, 2007.)  For the reasons given by the prosecutor, it is plausible that the form was generated by someone else and that the gun was tested without Zwicker's formal request for fingerprint testing or knowledge that such testing occurred.

Based on the above, Petitioner has failed to show that Zwicker perjured himself when he testified at both of Petitioner's trials that he did not request fingerprint testing of the gun attributed to Petitioner.  Even if Zwicker was mistaken about the facts, Petitioner has not shown that the prosecutor knew Zwicker's testimony was false.  Like Zwicker, the prosecutor was surprised to learn that the gun had been tested for fingerprints.  She

---

[2]   Rose, in fact, testified at Petitioner's second trial that he received the gun from Donaldson and that he put the gun in an envelope with a handwritten note stating, "Hold for prints."  (Trial Tr. Vol. II, 106-110 Apr. 26, 2007.)

offered plausible explanations for how the gun was tested for prints without a formal request from Zwicker. The state courts were reasonable in concluding the same. Petitioner is not entitled to relief on his claim.

### E. Ineffective Assistance of Trial Counsel

Petitioner contends that his trial attorney's acts and omissions deprived him of his constitutional right to effective assistance of counsel. Specifically, Petitioner says that trial counsel (1) failed to object to the prosecutor's presentation of certain testimony, (2) failed to object to the untimely production of transcripts, and (3) should have obtained forensic reports.

### 1. The State Court Decisions

Petitioner raised his first two claims about trial counsel in his motion for relief from judgment. The trial court found no merit in his claims because Petitioner "failed to prove that counsel's trial strategy was incompetent, and that his actions bore prejudice with adverse consequences." See the opinion denying Petitioner's motion for relief from judgment, People v. Kindle, No. 2006-013250-01, at 4 (Wayne County Cir. Ct. June 2, 2011). No state court addressed the merits of Petitioner's claim regarding trial counsel's failure to obtain forensic reports.

### 2. Clearly Established Federal Law

The Supreme Court's decision in Strickland v. Washington, 466 U.S. 668 (1984), is clearly established federal law for purposes of Petitioner's ineffective-assistance-of-counsel claims. Pinholster, 131 S. Ct. at 1403. Under Strickland, a defendant must

25

show that his trial attorney's "performance was deficient" and "that the deficient performance prejudiced the defense." Strickland, 466 U.S. at 687. "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." Id.

The "deficient performance" prong of the Strickland test "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. To demonstrate that counsel's performance prejudiced the defense, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' " but "[t]he likelihood of a different result must be substantial, not just conceivable." Harrington, 562 U.S. at 111-12 (quoting Strickland, 466 U.S. at 693).

### 3. Analysis

### a. Failure to Object to Testimony

Petitioner says that his trial attorney should have objected to the prosecutor's presentation of testimony from Jones, Draw, and Lancaster. Petitioner does not say why trial counsel should have objected to the testimony of these witnesses, but at his sentencing he stated that the prosecutor took these witnesses in her office to talk about their testimony. (Sentence Tr., 17, May 17, 2007.)

On direct appeal, Petitioner alleged that testimony from the three witnesses violated his right to a fair trial because their testimony differed from their testimony at his

26

first trial and because the prosecutor violated her duty to correct the false testimony.
The Michigan Court of Appeals reviewed the claim for plain error because Petitioner
failed to raise the issue before his sentencing.  The Court of Appeals ultimately
concluded that the record was "devoid of any evidence that error occurred, that the
purported error was obvious, and that it affected [Petitioner's] substantial rights."
Kindle, 2009 WL 2343159, at *6.

The Court of Appeals' decision was not unreasonable or contrary to clearly
established federal law.  Prosecutors are entitled to interview witnesses before trial,
United States v. Black, 767 F.2d 1334, 1337 (9th Cir. 1985), and the fact that the
witnesses' testimony at the second trial may have differed somewhat from their
testimony at the first trial does not mean that they perjured themselves at the second
trial.  They were thoroughly questioned at trial about their observations on the night in
question, and the Michigan Court of Appeals determined that the witnesses' testimony
at the second trial was generally consistent with their testimony at the first trial.

Trial counsel was not ineffective for failing to object to the prosecution's
presentation of testimony from Jones, Draw, and Lancaster.  Trial counsel questioned
Draw about his interview in the prosecutor's office and whether that was the first time
Draw mentioned seeing Petitioner in the men's bathroom wearing a Rock Bottom jacket.
Draw then conceded that the matter first came up during the interview in the
prosecutor's office.  (Trial Tr. Vol. II, 181-83, Apr. 26, 2007.).

### b. Failure to Object to Untimely Transcripts

Petitioner next says that trial counsel settled for less than the complete transcript
of the first trial and failed to object to the untimely production of transcripts on

constitutional grounds.  As noted above, however, the record indicates that trial counsel requested the transcript of the first trial, was granted his request, and indicated on the first day of the second trial that the matter had been resolved.

Even if trial counsel did not receive the entire transcript of the first trial, Petitioner has not shown how he was prejudiced by the lack of any particular volume of transcript. Petitioner is not entitled to relief on this claim.

### d.  Failure to Obtain a Request for Services[3]

Petitioner's final allegation of ineffectiveness is that trial counsel failed to request forensic reports, including the Request for Laboratory Services, which lists Zwicker as the requester for laboratory services on the Taurus handgun linked to Petitioner.

Petitioner is not entitled to relief on this ground.  Whether or not Zwicker requested testing of the Taurus handgun for fingerprints was not a critical issue in determining Petitioner's guilt or innocence.  The trial court, moreover, was made aware that Petitioner's fingerprints were not found on the gun.  As noted above, there were alternative explanations for how the gun got tested for fingerprints.  Trial counsel was not deficient in this regard.

### 4.  Conclusion on Trial Counsel

For all the reasons given above, the state courts' rulings on Petitioner's claims about trial counsel were not contrary to, or an unreasonable application of, <u>Strickland</u>.

---

[3] Although Respondent asserts that this claim is procedurally defaulted because Petitioner did not raise his claim in his motion for relief from judgment, it more efficient to go directly to the merits of Petitioner's claim rather than analyze whether the claim is procedurally defaulted.  Thus, any procedural default in connection with this claim is excused.

Given the double deference due to state-court rulings on ineffective-assistance-of-counsel claims, the Court concludes Petitioner is not entitled to relief on his claim about trial counsel.

### F.  Ineffective Assistance of Appellate Counsel

### 1.  The Claim and State Court Decisions

In his sixth and final habeas claim, Petitioner says that his Sixth Amendment right to effective assistance of appellate counsel was violated because his appellate attorney failed to raise all his claims on direct appeal from his convictions.  The state courts rejected this claim.

### 2.  Analysis

An appellate attorney's failure "to raise an issue on appeal can amount to constitutionally ineffective assistance."  Jalowiec, 657 F.3at 321.  An appellate attorney is not required to raise every non-frivolous claim requested by his or her client if counsel decides, as a matter of professional judgment, not to raise the claim.  Barnes, 463 U.S. at 751.

Here, appellate counsel raised Petitioner's double jeopardy claim on direct appeal, and Petitioner unsuccessfully raised his perjury claim on direct appeal. Petitioner's claims regarding the denial of his motion for a continuance and trial counsel's performance lack merit for the reasons given above.  As for Petitioner's first claim regarding the transcript of the first trial, appellate counsel could have concluded that Petitioner had what he needed for an effective defense or that Petitioner waived the issue when his attorney stated that the issue was under control. The claim is meritless,

and an appellate attorney is not ineffective for failing to raise a meritless claim on appeal. Shaneburger v. Jones, 615 F.3d 448, 452 (6th Cir. 2010) (quoting Greer v. Mitchell, 264 F.3d 663, 676 (6th Cir. 2001)).

## V. Certificate of Appealability

"[A] prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no automatic right to appeal a district court's denial or dismissal of the petition. Instead, [the] petitioner must first seek and obtain a [certificate of appealability.]" Miller-El v. Cockrell, 537 U.S. 322, 327 (2003). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller El, 537 U.S. at 327.

Reasonable jurists would not disagree with the Court's resolution of Petitioner's constitutional claims, nor conclude that the issues deserve encouragement further. Thus, Petitioner is not entitled to a certificate of appealability.

## VI. Conclusion

For the reasons stated above, the state courts' rejection of Petitioner's claims was not contrary to Supreme Court precedent, an unreasonable application of Supreme Court precedent, or an unreasonable determination of the facts. The state-court decisions also were not "so lacking in justification that there was an error . . . beyond

30

any possibility for fairminded disagreement." <u>Harrington</u>, 562 U.S. at 103.

Accordingly, the petition for a writ of habeas corpus is DENIED.  This case is

DISMISSED.  A certificate of appealability is DENIED.

SO ORDERED.


<u>S/Avern Cohn</u>
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated: September 2, 2015
    Detroit, Michigan